29 Cal.App.3d 481 (1972)
105 Cal. Rptr. 568
Estate of ELLIS M. MOORE, Deceased.
HOUSTON I. FLOURNOY, as State Controller, Petitioner and Appellant,
v.
CROCKER-CITIZENS NATIONAL BANK, as Trustee, etc., Objector and Respondent.
WILLIAM L. HOLLOWAY, as Executor, etc., Objector and Appellant.
Docket No. 11184.
Court of Appeals of California, Fourth District, Division One.
December 19, 1972.
*483 COUNSEL
Myron Siedorf, Walter H. Miller and Phyllis Kelly Fairbanks for Petitioner and Appellant.
Morrison, Foerster, Holloway, Clinton & Clark, Girvan Peck, Richard S. Kinyon and Prentiss Willson, Jr., for Objector and Appellant.
No appearance for Objector and Respondent.
OPINION
WHELAN, Acting P.J.
The Controller of the State of California (Controller) appeals from a judgment sustaining objections to the imposition of inheritance tax upon the assets of a trust created by Claus Spreckels (the Spreckels trust).
In a cross-appeal the executor of the estate of Ellis M. Moore appeals from that portion of the same judgment overruling objections to the imposition of inheritance tax upon the full value of the assets of a trust created by Ellis M. Moore (the Moore trust).
Claus Spreckels and Ellis M. Moore were husband and wife until the death of the husband in 1935.
Claus Spreckels created an irrevocable inter vivos trust on May 4, 1928. The trust was to terminate upon the death of the last survivor of the four children of Claus Spreckels and his wife, Ellis, living when the trust was created.
Ellis M. Spreckels was the beneficiary of one-quarter of the income, and she was given a power to appoint by will one-quarter of the principal.
The Spreckels trust provided one-quarter of the trust corpus should go to Ellis M. Spreckels should she be living at termination of the trust.
*484 The Spreckels trust contained this provision "If said ELLIS M. SPRECKELS [Ellis M. Moore] shall at any time waive any share of the income or principal of the trust estate, then the share of the income and the share of principal so waived shall be paid over to and divided among the said children of the Grantor and the issue of any deceased child of the Grantor, per stirpes and not per capita."
The Spreckels trust provided the right of the beneficiaries, other than Ellis M. Spreckels, to income or principal might not be assigned or anticipated and should not be subject to the claims of creditors.
Claus Spreckels died on January 12, 1935.
By December 24, 1942, Ellis M. Spreckels had remarried; her husband was E. Clarence Moore.
On December 24, 1942, Ellis M. Moore executed an agreement by which she relinquished the right to appoint the one-quarter interest in the trust assets except to one or more persons who were designated as her spouse, the descendants of her spouse, the descendants of Claus Spreckels, and the spouses of any such descendants.
The agreement declared she did not obligate herself to exercise the power of appointment, or not to exercise it except to herself, her estate, her creditors, or any person other than among those persons or classes of persons designated.
Ellis M. Moore died on October 26, 1967.
In her last will Ellis M. Moore declared in execution of the power she appointed the four-sixteenths of the principal of the Spreckels trust over which she had such power to her surviving children, and per stirpes to the surviving issue of any child who might predecease the testatrix.
Frank Spreckels, one of the four children, died May 7, 1948, leaving no issue.
The children of Ellis M. Moore that survived her are Tookie S. Northcutt, Claire S. Brey and Claus Spreckels, Jr., all of whom had issue living at the death of Ellis M. Moore.
The four children were born respectively in 1911, 1912, 1917 and 1928. Ellis M. Moore, when she died on October 26, 1967, was 78 years of age. Her oldest surviving child was 56 years old.
At the time of Mrs. Moore's death, Mrs. Brey had three living children; Mrs. Northcutt, two; and Claus Spreckels, one. All but one of the grandchildren were girls.
*485 Ellis M. Spreckels created an inter vivos trust on August 12, 1932 and made it irrevocable on March 7, 1933. Crocker First Federal Trust Company, now Crocker-Citizens National Bank, was named trustee and continues to act as such.
All income was to be paid to Claus Spreckels during his lifetime. If the trust survived beyond the death of Claus Spreckels, the income was to be divided among the trustor and her four children; but the share of income of any child was to be paid to the mother until the child attained the age of 21 years, and thereafter one-half was to be paid to the mother until the child attained the age of 30 years; the share of income of a child deceased without issue was to be divided among the mother and surviving children and the surviving issue of any deceased child per stirpes.
The trust was to terminate upon the last in time of the following contingencies:
The death of the trustor leaving surviving issue born to one of the four children.
The death of the last survivor of the four children.
The death of Claus Spreckels.
If the trust were to terminate by reason of the death of Claus Spreckels, the trust assets would be distributed subject to other contingencies: if there were no living issue of any of the four children of Claus Spreckels and the trustor, but Claus Spreckels then had living issue, then to such other issue of Claus Spreckels; if he had no other living issue, then to three named cousins of the trustor.
If the trust should terminate upon the death of the last survivor of the four children of Claus Spreckels and the trustor, and there were no living issue of any of such four children, the trust assets should pass to the appointee under the last will of said last surviving child.
If the trustor were to survive Claus Spreckels and their four children, and should there be no surviving issue of any of said children, the trust should terminate and the trust assets be delivered to the trustor.
If during the life of the trust any of the four children should die leaving surviving issue, the following would happen: If the death occurred after the death of Claus Spreckels, there was to be paid to the issue of such deceased child a share of the trust principal measured by a fraction, of which the deceased child was the upper figure, and the lower figure of which was to be made up of the trustor, if then living, the surviving children and any other deceased child who had left surviving issue; if any child leaving *486 surviving issue might have predeceased Claus Spreckels, the same disposition was to be made in favor of such surviving issue upon the death of Claus Spreckels.
The declaration of trust provided the income beneficiaries, other than Ellis M. Spreckels herself, should have no power to assign or anticipate income or any right to income, and that their rights should not be subject to the claims of creditors.
The death in 1948 of Frank Spreckels, one of the four children, without issue, left the trust principal undiminished.
The trial court held none of the four-sixteenths of the Spreckels trust appointed by Ellis M. Moore by her last will was subject to inheritance tax, and held the Moore trust to be fully taxable, and, as stipulated by the parties, at the rates and exemptions in effect on March 7, 1933.

THE SPRECKELS TRUST
The primary theory presented by Controller for taxability of the four-sixteenths interest in the Spreckels trust is that the 1942 agreement was a release of the power within the meaning of Revenue and Taxation Code section 13697,[1] making taxable property which but for such release would be taxable under section 13696[2] providing for taxability of property subject to a general power of appointment whether exercised or not exercised.
*487 In arguing the 1942 agreement was a transfer, Controller was faced with a dilemma: If in fact it was a transfer, then Mrs. Moore's interest in the trust was disposed of by the transfer, subject to her retained income interest during life, but in that event the transfer was not a taxable transaction at the time the agreement was made.
The dilemma was met to the satisfaction of Controller by the argument that the transfer was an incomplete transfer under inheritance and gift tax law as defined in regulation 13304, subdivision (c) which provides: "The term `incomplete transfer' includes any transfer under which the rights of the transferee are contingent or the transferor reserves the right to revoke, terminate, alter, amend, revise, or change the interest of the transferee." (Cal. Admin. Code, tit. 18, § 658.3.)
Controller sums up his reasons for contending the interest in the trust is taxable in the following language: "It was not until the moment of decedent's death that the ultimate beneficiaries were known. Until then any transfer was incomplete. Keck v. Cranston, supra [236 Cal. App.2d 39, 47]. Decedent held the strings until her death. The transfer then became complete and subject to inheritance tax. Estate of Madison, supra [26 Cal.2d 453]. The taxable transfer took place at decedent's death."
That is another way of saying within the factual framework of this case that the exercise of a limited power of appointment is taxable, although the statute in existence when Mrs. Moore died made taxable only the exercise of a limited power of appointment within the definition of Revenue and Taxation Code section 13695.[3]
However, in answer to a question by this court, Controller has explicitly disavowed any claim the trust interest was taxable under section 13695.[4]
*488 The central question under Controller's theory is whether the 1942 agreement was the release by Mrs. Moore during her lifetime of a power with respect to property which, but for such release, would be subject to *489 tax under section 13696, and was of such a nature if it were a transfer of property owned by Mrs. Moore the transfer would be subject to the provisions of article 3 of chapter 4 of part 8 of division 2. If so the agreement would have been a transfer taxable at the death of Mrs. Moore. (Rev. & Tax. Code, § 13697.)
There is slight analogy between the act of the creator of a trust who reserves the right to alter its disposition and later gives up that right, and the act of the donee of a power of appointment who gives up or abridges that power.
In the first instance the settlor has made a reservation of certain rights but for which the creation of an irrevocable trust would have constituted a completed gift. (1) As quoted in Keck v. Cranston, 236 Cal. App.2d 39, 44 [45 Cal. Rptr. 634] from Hesslein v. Hoey, 91 F.2d 954: "`If during his life he shall terminate his reserved powers, a gift tax will then accrue. If they are terminated by his death, the property will be subject to an estate tax.'"
(2) In the case of a power over the disposition of trust property held by someone other than the creator of the trust, a surrender of the power by the donee is not a taxable transaction unless declared to be so explicitly. There could be said to be a gift by the donee of a power only where the power may be and is exercised during his lifetime.
Under the theory of Controller, it is necessary to consider whether, if the power granted to Mrs. Moore had been one reserved by herself in an irrevocable trust created by herself, the limitation of its exercise as a result *490 of the 1942 agreement would have been a release of such a nature that it would have been subject to article 3 of chapter 4 of part 8 of division 2 of the Revenue and Taxation Code.[5]
But if Ellis Moore had created the trust and reserved to herself for life a one-fourth interest in the income and a general power of appointment over that one-fourth interest, the transfer in trust would have been of the kind taxable under section 13643 or 13644 without regard to the 1942 agreement.
Section 13696 makes taxable either the exercise or nonexercise of a general power of appointment possessed at the time of his death by a decedent.
Section 13697 states also that the lapse of a power of appointment during the lifetime of the individual possessing the power shall be considered a release of such power.
The release of the general power effected by the 1942 agreement was perhaps made with an eye to escape federal estate tax. Before the federal 1942 Revenue Act, the effective date of which was October 21, 1942, only the exercise of a power of appointment was taxable. The taxation of the mere possession of unexercised powers was new to the federal tax system. Further, only the exercise of a general power of appointment was taxable before the 1942 act. That act taxed the exercise of certain special or limited powers of appointment as well as the mere possession of unexercised powers. The 1942 act applied to powers created before as well as after its enactment. It provided a short period, that is, up to January 1, 1943, for the release of pre-existing powers without tax liability.
The Internal Revenue Act of 1954 provided: "If a general power of appointment created on or before October 21, 1942, has been partially *491 released so that it is no longer a general power of appointment, the exercise of such power shall not be deemed to be the exercise of a general power of appointment if 
"(i) such partial release occurred before November 1, 1951...." (Title 26, U.S.C.A. ch. 11, § 2041, p. 209.)
The 1942 agreement was a release in such manner as to reduce or limit the "persons or objects, or classes of persons or objects, in whose favor such [power] would otherwise be exercisable." It was therefore one of the kinds of releases authorized by Civil Code section 1060, first enacted in 1945, which validated such releases theretofore made.[6]
Civil Code section 1060 went further than to permit limitations as to the persons in whose favor the power might be exercised, those being the limitations that distinguish a limited power from a general power. (Rev. & Tax. Code, §§ 13692 and 13693.) It authorized also a release with respect to the whole or any part of the property subject to the power.
(3) Although the 1942 agreement lacked statutory authorization when made, it was not, therefore, invalid. (See Rest., Property, § 334.)
Section 13696 makes taxable the exercise or the nonexercise of a general power of appointment that the decedent has at the time of his death. Had Mrs. Moore had a general power at the time of her death, her exercise of it would have been taxable. Had she possessed it when present section 13697 was first enacted in 1965, a subsequent release would have become taxable under that section. Had that statute been in effect when she executed the release and at her death, the appointed property would have been taxable.
Since, however, section 13697 states that the release itself is a transfer, to say that section 13697 was intended to make taxable a transfer that had been made in 1942 would be to give it a retroactivity that does not appear upon its face.
The 1942 agreement was not a transfer within the meaning of section 13697.
We do not accept the theory of Controller that the 1942 agreement was itself a transfer by Mrs. Moore, made with the intention that it take effect in possession or enjoyment at or after her death (§ 13643).
Neither can we accept the theory it was a transfer by Mrs. Moore under *492 which she expressly or impliedly reserved an income or interest for her lifetime (§ 13644).
If the contract of 1942 was a transfer, it could not have been a transfer made in contemplation of the death of Mrs. Moore under section 13642.
(4) The appointed property was not subject to tax under sections 13696 and 13697.

THE MOORE TRUST
Was the transfer in trust made "with the intention that it take effect in possession or enjoyment at or after the death of the Transferor," Ellis M. Spreckels?
There are certain significant factors with regard to the trust.
The death of one of the surviving three children during the remaining life of the trust, and after the death of the trustor, would result in a distribution of a proportionate share of the trust corpus to the surviving issue of such child.
The life of the trust was to be measured by the life of the trustor only in the event she survived her husband and their four children and there were then living issue of one or more of the children.
If the trust terminated by reason of the death of Mrs. Moore, those who would take would be the surviving issue of at least one of the children by Claus Spreckels. The trust corpus available for distribution to such surviving issue could be as little as one-half of the total, depending upon whether there had been earlier distributions to the surviving issue of predeceased children of the trustor. If there should have been no such distributions, but the issue of only one of the children of the settlor survived her, the additional share of income going to such surviving issue by reason of the settlor's death would be one-half of the total.
It is a feature of the trust provisions that upon the death of Mrs. Moore there fell in the right of reversion that was contingent upon her surviving all of her children and grandchildren.
The effect of the falling in of that contingent reversionary interest was not however to enhance the life interest of any of the three children in that share of the income they had enjoyed during their mother's lifetime.
On the other hand, the effect of the possible survival of the mother beyond the deaths of her last surviving child and all her grandchildren would depend upon a number of other contingencies.
*493 The whole of the trust would come to her only in the event that not only her three children predeceased her, but that each of those children was predeceased by all his or her own issue.
The death of one of her children leaving issue during her lifetime would result in the withdrawal from the trust of a share of the corpus proportionate to a number made up of the number of Mrs. Moore's children living before that death occurred plus one, representing the trustor herself.
In the event of the termination of the trust during the lifetime of the trustor and the reversion to her of the trust corpus, that corpus would be subject to tax upon its passing to her heirs or legatees.
There was another respect in which the death of Mrs. Moore might affect the enjoyment of a part of the trust income; that is, were she to die before one or more of the children had attained the age of 30 years.
But the right to a fixed share of the income for life became absolute in any of the four children who survived the father and attained the age of 30 years, and such right was not to be measured by the life of the trustor.
None of the four children could ever enjoy or have possession of any part of the corpus regardless of when Mrs. Moore might die. The last survivor of the four children could appoint by will the trust property but only if he outlived both parents and was their only surviving issue.
Absent the provision for retention of a share of the income during the trustor's lifetime, the provision for a reversion would be the only peg upon which to hang a tax.
If that is not a strong enough peg, should the entire corpus of the trust be held taxable because, by the death of the trustor, her children came into possession and enjoyment of one-fourth of the income, and one-fourth of the principal was made available for division among the grandchildren by right of representation when any of the trustor's children might die thereafter?
The executor argues there were four separate trusts, of one only of which Mrs. Moore was life tenant and whose assets passed by reason of her death to the life tenants of the other three trusts. Clearly, however, there was at the time of its creation only one trust, all of whose income was to be paid to one person. The fact that under the terms of the trust instrument the trust assets, by reason of the death of one of the children, had become divisible by four rather than by five, did not result in there being four trusts rather than one.
In actual fact, by reason of the course of events, the trust did not terminate *494 by reason of Mrs. Moore's death and the share of income released thereby was one-fourth of the whole.
It remains true, however, that, except as to portions of the trust principal that might have been distributed under contingencies provided for but which did not occur, the persons who would ultimately take the trust corpus and their share of the corpus could not have been known until after the death of the settlor, nor could their interests in the corpus be other than an expectancy.
The answer would be clear if we dealt with federal law, under which at the present time the existence of a reversionary interest in favor of the settlor of a trust will not make the transfer in trust taxable, lacking other independent taxable features, unless the value of the reversionary interest immediately before the decedent's death determined by usual methods of valuation should exceed 5 percent of the value of the property transferred (26 U.S.C.A. § 2037).
Such a statutory enactment had been necessary, however, to escape the effect of the decision in Fidelity Co. v. Rothensies, 324 U.S. 108, 111-112 [89 L.Ed. 782, 785, 65 S.Ct. 508, 510, 159 A.L.R. 227], where the court said: "No more should the measure of the tax depend upon conjectures as to the propinquity or certainty of the decedent's reversionary interests. It is enough if he retains some contingent interest in the property until his death or thereafter, delaying until then the ripening of full dominion over the property by the beneficiaries. The value of the property subject to the contingency, rather than the actuarial or theoretical value of the possibility of the occurrence of the contingency, is the measure of the tax."
(5) California, in its interpretation of the meaning of a transfer intended to take effect in possession or enjoyment at or after the death of the transferor, had followed and was following the federal courts in their interpretation of that clause up to the time of the decision in Fidelity Co. v. Rothensies, supra, 324 U.S. 108.
However, California has provided no legislation to overcome the effect of that decision. In the absence of such legislation, we are bound to follow the prior rule that a reserved right of reversion places a transfer within the taxable class.
The policy of the law is declared in section 13648 as follows: "It is hereby declared to be the intent and purpose of this part to tax every transfer made in lieu of or to avoid the passing of property by will or the laws of succession." It derives from section 27 of chapter 395 of the Statutes *495 of 1911, since when a similar provision has been at all times a part of California law.
Prior to the enactment of a gift tax law in California, a completed gift not made in contemplation of death was not subject to tax. In consequence, the taxability of other inter vivos transfers, not supported by valuable and adequate consideration, was based upon circumstances that made a gift incomplete. Thus were developed the concepts embodied in sections 13643, 13644, 13645 and 13646.
There are differences between the Fidelity Co. case and the present one. The trustor retained all the income for her life under the former, and a power to appoint if both of her daughters predeceased her without issue.
On the other hand, the retention of the income by the trustor is not required if a transfer in trust is taxable under section 13643. (Estate of Madison, 26 Cal.2d 453 [159 P.2d 630].)
The Moore trust was created before the enactment in 1939 of gift tax legislation in California. The trust, when made irrevocable in 1933, might have become a completed gift over whose dispositions during the continuance of the trust the settlor retained no power to change, but for the fact she did provide for a reversion to herself upon a termination of the trust should all the possible beneficiaries predecease her.
She also provided for a division of any trust principal remaining at her death should she survive her husband and children, but be survived by issue of a deceased child or children.
In a comprehensive study of Taxation of Transfers Intended to Take Effect in Possession or Enjoyment at Grantor's Death, by Professor Henry Rottschaefer, which appeared in 14 Minnesota Law Review 453 and 613 (April and May 1930) and was updated in 26 Iowa Law Review 514 (March 1941), the learned author wrote (26 Iowa L.Rev. 537): "It is however, a definitely established principle that a transfer by which a grantor divests himself of his entire interest in property by creating therein interests in others of such character that possession and enjoyment thereof are in no manner contingent on the grantor's death, is not one intended, etc., and that the succession to such interests is not taxable. In determining whether a transfer belongs in this category, account must be taken of the decisions concerning the effect upon taxability of provisions by which the grantor retains a power to revoke, other powers, or a possibility of reverter, and by which the interests created remain contingent in title until the grantor's death."
*496 In the absence of a statutory authorization to disregard a possibility of reversion specifically provided for in the trust instrument, we are of opinion the transfer must be held as one intended to take effect in possession or enjoyment at or after the death of the transferor as to that part of the transferred property subject to such possible reversion, that is, the corpus of the trust.
The possible reversion to the trustor could only have been to such of the trust corpus as might remain after the death of all the trustor's descendants. It could not affect the life income interests, all of which must necessarily have terminated.
It was the transfer in trust that was the taxable incident, if any. (Estate of Madison, supra, 26 Cal.2d 453.) It was as of the time of that transfer that it was to be determined whether the transfer was made with the intention it take effect in possession or enjoyment at or after the death of Mrs. Moore.
The tax, if any, was to be upon the value of that which the beneficiaries took by reason of that death. Since one-fourth of the income was then being enjoyed by each of the three surviving children for his or her life, it might seem logical to value those three-fourths of the principal as being respectively diminished by the values of the life estates in the income which they respectively supported.
That logic has made its appeal to the executor, who cites in support of such a disposition Estate of Johnson, 233 Cal. App.2d 785 [43 Cal. Rptr. 913], where a remainder interest in a trust created under Missouri law and whose assets were in Missouri was possessed by a California decedent.
The obvious difference is that here the creation of the trust was the transfer. In Estate of Johnson, supra, the creation of the trust was not subject to the laws of California, and the taxable event was the devolution of the remainder interest possessed by the decedent.
In Estate of Madison, supra, 26 Cal.2d 453, the beneficiaries of two of the trusts had the income from those trusts and the tax was upon the full value of the corpora. (See also Commissioner v. Estate of Field, 324 U.S. 113, 115 [89 L.Ed. 786, 788, 65 S.Ct. 511, 512, 159 A.L.R. 230].)
But there are significant points of difference between the Moore trust and those dealt with in Estate of Madison, supra, 26 Cal.2d 453, 463-464, as appears from the following portions of the opinion in Madison: "Even though a trustor may have parted with all interest in the property, limitations that he has imposed will last as long as the trust lasts. Decedent's *497 children were all over 21 years of age at the time the trusts were created. The daughters were married. It is unlikely, therefore, that decedent entertained any doubts as to the ability of the beneficiaries to manage the property. If it had been because of such doubts that he chose to make the gifts in trust rather than outright, he hardly would have provided that the trusts should terminate upon his death. Moreover, since the trusts are not in the nature of a family settlement, with the usual provisions for life estates to children and remainders to grandchildren, the conclusion is inescapable that decedent advisedly chose to make gifts in trust so that, for the rest of his lifetime, the principal would be kept intact and the income would be paid to the family of which he was the head."
In the Moore trust there were provisions for life estates to children and remainders to grandchildren, to the extent that the trust terminated as to a proportionate share of the corpus upon the death of a child leaving surviving issue. Thus, unlike the trust in Madison, supra, the principal need not have been kept intact for the rest of the settlor's life.
Nor was the Moore trust to terminate at the death of the settlor, unless in the contingency she survived her husband and all her children.
When the Moore trust was created, the eldest child was 21 years old, the youngest 4 years old.
Clearly, the Moore trust would be considered in the nature of a family settlement, especially when viewed alongside the earlier Spreckels trust and its provisions.
In Estate of Madison, supra, 26 Cal.2d 453, the right of the beneficiary to income was measured by the life of the trustor, which also determined the continuance of the trust. When the trust terminated by his death, the remaining corpus passed to the income beneficiary, undiminished in value by any income estate.
In the case of the Moore trust, the corpus, whose final devolution remained contingent at the death of the settlor, was subject to three estates in the income for the lives of three of the children, all of which had vested during the life of the trustor and might continue after her death. They were a charge upon three-fourths of the corpus, the possibility of reverter of which to the trustor was the only provision in the instrument creating the trust that made it a transfer intended to take effect in possession and enjoyment at or after the death of the trustor.
Had the California Gift Tax Law (Rev. & Tax. Code, div. 2, pt. 9, § 15101 et seq.), as it now exists, been in effect when the Moore trust *498 was made irrevocable, there would have been a gift of income to the four children of the trustor within the meaning of section 15104, which would have been subject to the gift tax under section 15201.
The author of a note in 159 A.L.R. 233, 241, deduces the following from a study of decisions by the federal courts with reference to federal estate tax: "Where property has been transferred under an inter vivos instrument creating a life estate in some person other than the grantor or settlor and, by the terms of the transfer, such life estate vests at once and passes from the exclusive control of the transferor, then, assuming the life tenant survives the grantor or settlor and the transfer is subject to Federal estate taxation as one intended to take effect in possession or enjoyment at or after death, the value of the life estate outstanding at the transferor's death must be deducted from the full value of the property in computing the estate tax, since it is clear that possession and enjoyment of that interest passed prior to the decedent's death."
The writer proceeds to say (pp. 246-247) that the conclusion so deducible finds support in several cases involving state inheritance or estate taxes and cites In re Dunlap, 205 App.Div. 128 [199 N.Y.S. 147]; In re Carnegie, 203 App.Div. 91 [196 N.Y.S. 502], affirmed 236 N.Y. 517 [142 N.E. 266]; In re Hayes, 240 App.Div. 756 [266 N.Y.S. 16], affirmed 264 N.Y. 448 [191 N.E. 507]; Topping v. McLaughlin, 125 Conn. 456 [6 A.2d 343].[7]
The remaining values at the date of the trustor's death of those three life estates in income should be deducted from the value of the corpus in determining the amount subject to tax.
That was the method of disposition in Miller v. Connelly, 142 Conn. 144 [112 A.2d 202], cited by Controller, although not as the result of the judicial decision but because the tax commissioner conceded it was proper. In that case an irrevocable trust provided a life income to the trustor's daughter, with remainder to her sons. There was a possibility of reverter to the settlor as an heir of his daughter or grandchildren, which it was held made the trust assets taxable in the settlor's estate, it having been conceded the value of the daughter's remaining life estate should be subtracted in determining the amount subject to tax.
In the quoted articles by Professor Rothschaefer, he dealt with the taxability of life estates extending beyond the death of the settlor where *499 the settlor had reserved a power to revoke, and said of them: "The same consideration militates against taxing the value of that portion of a life estate that endures beyond the grantor's death which the grantee has enjoyed prior thereto. The uses obtained by the life tenant thereafter might not unreasonably be subjected to the tax, and the cases heretofore cited taxing life estates created by a transfer in which the grantor reserves a power of revocation tax at least the enjoyment of the economic benefits accruing after the grantor's death at their value as of the date of such death." (26 Iowa L.Rev. 532.)
Here, however, there was no power to revoke. The continuance of the life estates enjoyed before death was in no way affected by that death. As for the values of those portions of the life estates enjoyed before death, they might be said when created irrevocably to diminish as of that time the value of the property placed in trust and subject to reversion; they did not at the time of Mrs. Moore's death when the tax became payable diminish the value of the property as to which the possibility of reversion was terminated by that death.
(6) In our opinion, therefore, the one-fourth interest in the trust assets whose income Mrs. Moore enjoyed is fully taxable. The interest in the three-fourths subject to the life estates in the three children is taxable as to the value thereof, less the values of the remaining life interests.
The order appealed from is affirmed as to the nontaxability of the Spreckels trust under sections 13696 and 13697. It is reversed as to the amount of the tax liability on the assets of the Moore trust and remanded with directions to fix the tax in accordance with the views expressed herein.
The executor shall recover his costs of appeal.
Ault, J., and Cologne, J., concurred.
A petition for a rehearing was denied January 16, 1973, and the application of petitioner and appellant for a hearing by the Supreme Court was denied February 14, 1973.
NOTES
[1] Section 13697 reads: "The exercise or release by the decedent during his lifetime of a power with respect to property which, but for such exercise or release would be subject to tax by virtue of the preceding section, is a transfer subject to this part if the exercise or release is of such a nature that if it were a transfer of property owned by the decedent such transfer would be subject to this part under Article 3 of Chapter 4 of this part. A disclaimer or renunciation of such a power of appointment shall not be deemed a release of such power.

"The lapse of a power of appointment during the life of the individual possessing the power shall be considered a release of such power. The preceding sentence shall apply with respect to the lapse of powers during any calendar year only to the extent that the property, which could have been appointed by exercise of such lapsed powers, exceeded in value, at the time of such lapse, the greater of the following amounts:
"(a) Five thousand dollars ($5,000), or
"(b) Five percent of the aggregate value, at the time of such lapse, of the assets out of which, or the proceeds of which, at the exercise of the lapsed powers could have been satisfied."
[2] Section 13696 reads: "If at the time of his death a decedent has a general power of appointment with respect to property, the exercise of the power is subject to this part as a transfer of the property from the decedent to the person to whom the property is appointed and the decedent's failure to exercise the power is subject to this part as a transfer of the property from the decedent to the person to whom the property passes by virtue of the nonexercise of the power. For purposes of this section, the power of appointment shall be considered to exist on the date of the decedent's death even though the exercise of the power is subject to a precedent giving a notice or even though the exercise of the power takes effect only on the expiration of a stated period after its exercise, whether or not on or before the date of the decedent's death notice has been given or the power has been exercised."
[3] Section 13695 reads: "Where a limited power of appointment given in conjunction with a disposition of property effected before 5 p.m. of June 25, 1935, by a donor who died prior to that date, is exercised after that date by the donee, the exercise of the power is a transfer subject to this part from the donee to the person appointed at the time of the exercise, as though the property to which the power relates belonged absolutely to the donee and is transferred by him by will."
[4] But for Controller's position section 13695 is inapplicable, it might reasonably be argued that the power of appointment, general by its creation and made limited by the act of the donee of the power, was "a limited power of appointment given in conjunction with a disposition of property effected before 5 p.m. of June 25, 1935, by a donor who died prior to that date ... exercised after that date by the donee" so that its exercise was a taxable transfer under section 13695.

The limited power of appointment was given at some time; it was not given at the time Mrs. Moore executed the 1942 agreement; she did not give it to herself; it could have been given only by Claus Spreckels when he created the trust. It is true it was not a limited power when given; but in giving the general power, the donor included in the gift whatever the general power contained. The lesser was included in the greater.
It would not follow that if the limited power given by Claus Spreckels in 1935 was included within the general power then given, a statute imposing a tax on the exercise of a general power of appointment would tax also the exercise of a limited power; there is no such implication. Here, the statute taxes specifically the exercise of a limited power; the only question is when that power was given.
It is possible to argue further, but with artificiality, that the language of the section does not require that the limited power have been given by the instrument by which "a disposition of property was effected," or at the same time, but only in conjunction with the disposition of property; and that the limited power, whenever or by whatever instrument given, was in conjunction with a disposition of property effected before 5 p.m. of June 25, 1935, by a donor who died before that date.
No disposition of property was effected by the 1942 agreement, which neither exercised nor agreed to exercise the power of appointment.
When Claus Spreckels created the trust, the law provided as follows: "Whenever any person, trustee or corporation shall exercise a power of appointment derived from any disposition of property made either before or after the passage of this act, such appointment when made, shall be deemed a transfer taxable under the provisions of this act, in the same manner as though the property to which such appointment relates belonged absolutely to the donee of such power, and had been bequeathed or devised by such donee by will...." (Stats. 1925, ch. 284, § 2(6). pp. 474-475.)
The statute was derived from section 2(6) of chapter 821 of the Statutes of 1921, which was in the same language.
In 1929 the act was again amended so as to declare only the exercise of the power of appointment as a taxable transfer, eliminating the provision as to the effect of a nonexercise of the power.
After June 25, 1935, the effective date of the Inheritance Tax Act of 1935, the statute provided in part as follows: "Whenever any person or corporation shall be given a power of appointment by virtue of any disposition of property made before or after the passage of this act, such gift of power of appointment shall, under the provisions of this act, be deemed a taxable transfer made from the donor of said power to the donee thereof at the date of the donor's death; provided that where the donor of a power of appointment dies prior to the taking effect of this amendment and the power is exercised thereafter the exercise of said power of appointment shall be deemed a transfer taxable as provided in subdivision 6 of section 2 of the Inheritance Tax Act of 1921 as amended in 1929." (Stats. 1935, ch. 358, § 2(6), p. 1269.)
At the time of the execution of the 1942 agreement to limit the exercise of the power among certain persons only, the statute provided as follows: "Whenever any person or corporation shall be given a general or limited power of appointment by virtue of any disposition of property made before or after 5 p.m. of June 25, 1935, such gift of power of appointment shall, under the provisions of this act, including Subdivision (10) of this section, be deemed a taxable transfer made from the donor of said power to the donee thereof at the date of the donor's death, except that:
"(a) Where the donor of a power of appointment died prior to 5 p.m. of June 25, 1935, and the power is exercised thereafter, the exercise of said power of appointment shall be deemed a transfer taxable as provided in Subdivision (6) of Section 2 of the Inheritance Tax Act of 1921, as amended in 1929." (Stats. 1941, ch. 177. § 1, p. 1222.)
In 1943 the statute was amended and remained in the same form as Revenue and Taxation Code section 13693 until 1965. It read: "Where a general or limited power of appointment given in conjunction with a disposition of property effected before 5 p.m. of June 25, 1935, by a donor who died prior to that date, is exercised after that date by the donee, the exercise of the power is a transfer subject to this part from the donee to the person appointed at the time of the exercise, as though the property to which the power relates belonged absolutely to the donee and is transferred by him by will."
In 1965 former section 13693 was repealed, and sections 13694, 13695 and 13696 were enacted in the form they had at the time Ellis M. Moore died.
Thus at all relevant dates prior to 1965, the exercise by Mrs. Moore of the power, whether as a general or limited power, was in express language made taxable.
Under the 1965 enactments, where the donor of the power, whether general or limited, has survived after June 25, 1935, the gift of the power is taxed under section 13694 upon the death of the donor, except as to a general power which is exercised upon the death of the donee, when the property is taxed under section 13696 as a gift from the donee to the person appointed to take.
There is no evidence of a conscious intention on the part of the Legislature in 1965 to free from taxation property appointed under a power given prior to June 25, 1935, by a donor who died prior to that date, which was general in its creation but made limited after the death of the donor by the voluntary act of the donee. Unless the condition of the law as the result of inadvertence or oversight left a gap for the first time since 1935 as to the taxability of a limited power deriving from a general power given before June 25, 1935, by a donor who died before that date, the appointed property arguably is taxable under section 13695.
[5] Controller seems to recognize the validity of that argument. In his reply brief he writes: "Section 13697 requires us to consider that the property was owned by decedent, so, any restrictions imposed by Claus Spreckels are not to be considered. Hence, there would have been a transfer intended to take effect at or after death and taxable under Section 13643. Here, it is as if decedent had created an inter vivos trust under which she reserved a power of appointment which was to be exercised by will.... A transfer is taxable as intended to take effect at or after death where property is deeded in trust to be disposed of in accordance with the grantor's will or the grantor reserves the right to dispose of the property by will."
[6] Section 1060 was repealed by an act of 1969 operative July 1, 1970, and has been superseded by Civil Code section 1388.2.
[7] In Topping v. McLaughlin, the settlor of the trust reserved a conditional power of revocation. For that reason it was overruled in Cochran v. McLaughlin, 129 Conn. 176 [27 A.2d 120].